[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————————

No. 23-12132

Non-Argument Calendar

————————————————

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

JORGE MOJOCOA,

Defendant-Appellant.

————————————————

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 5:22-cr-00017-GAP-PRL-1

————————————————

Before WILSON, BRANCH, and LUCK, Circuit Judges.

PER CURIAM:

Jorge Mojocoa offered and agreed to pay $60 to have oral sex with a 12-year-old girl who was unable to speak, paralyzed from the waist down, and who needed money for medical bills because her mother had just died. Thankfully, the act itself never happened—Mojocoa made this deal with an undercover agent posing as the girl's aunt, and the would-be-victim was imaginary. Mojocoa was arrested at the arranged meeting place carrying the Skittles and lubricant the agent had told him to bring for the girl. While in custody, Mojocoa admitted to the underlying conduct. But he argued at trial that the government had entrapped him. The jury rejected that defense and found him guilty of attempted enticement of a minor to engage in sexual activity.

This is Mojocoa's appeal. He raises four arguments. First, Mojocoa argues that the district court should have granted his motion for a judgment of acquittal because the government did not prove that he was "predisposed" to comment the offense independent of the undercover agent's influence. Second, he asserts that the district court abused its discretion in allowing the government to introduce a jail call between him and his wife into evidence, in which he acknowledged that he had confessed, because the call was protected by spousal privilege and unduly prejudicial. Third, he contends that the district court abused its discretion in not giving a modified instruction on the entrapment

defense. And finally, he urges that the government shifted the burden of proof in closing arguments by telling the jury it would need to find that he was the unluckiest man in the world to acquit him. We reject each argument and affirm.

## I.     Background

### A. The Offense Conduct, Arrest, and Indictment

The government's key witness at trial was Agent Angela Fitch of the Unified Drug Enforcement Strike Team with the Marion County Sheriff's Office. In 2021, Fitch was assigned to an undercover operation investigating child predators. In that role, Fitch posted internet advertisements posing as an aunt soliciting her (imaginary) niece for prostitution.

On March 29, 2022, she posted an advertisement on Craigslist as part of the operation. The advertisement did not explicitly say that it was advertising a young child for sex, because Craiglist flags such ads. The ad represented that she, the poster, had a 12-year-old niece who was paralyzed and was unable to communicate, and had substantial medical bills. The ad stated that the poster was "looking for someone who would enjoy [the girl's] company[.]"

Mojocoa responded to the advertisement. He asked whether Fitch was with the police. In order to give him an out, Fitch asked if Mojocoa was with the police and said that, if so, she did not think they should continue the conversation. Fitch said she would call him the next day, in (she said) another effort to give him a chance to rethink the situation.

On a phone call the next day, Mojocoa and Fitch discussed a planned sexual encounter with the young girl. Mojocoa asked Fitch if the young girl could get pregnant. He assured Fitch that he did not need condoms because he "shoots blanks." Mojocoa confirmed that he wanted to have sex with the girl, but, because she was paralyzed, asked "[h]ow do we do it?" Mojocoa asked Fitch multiple times how much she charged to pimp out her niece. Fitch never stated a particular price, but she did tell Mojocoa that another man had paid $100. Mojocoa offered to pay $60 for oral sex. In a follow-up text message, Fitch told Mojocoa that "the other guy did everything. She[, the young girl,] has no feeling in her lower body, so you can do whatever you want."

On a later phone call, Mojocoa remarked that Fitch was a woman. He said "[t]hat's something different, something new. It just . . . never happened to me like that." Mojocoa also said that, if the encounter worked out, they could make it "a regular thing." Later on, Fitch told Mojocoa to bring Skittles for the girl. Fitch explained that she mentioned Skittles to make sure that Mojocoa knew the girl was a child and to help identify him at the scene of the meet-up.

On the day of the rendezvous, Mojocoa texted Agent Fitch that he was on his way and reiterated that he hoped he was not being set up by the police. He also said that if he was being set up, it would destroy him and his family. He also said that he was nervous because he "never did [sic.]" Fitch said that she was "nervous too" but "need[ed] the money." She added, "[p]lus, since

[the young girl] doesn't feel anything from the waist down, it's not like she is getting hurt, and she can't tell anyone." When Mojocoa arrived—two hours early—he asked what to do, and Fitch texted him: "Go grab some lubricant. She is still practically a virgin. She is only 12." Mojocoa said he would go to Walmart.

Once Mojocoa arrived at the meeting place, he was surrounded and arrested. Law enforcement found two bags of Skittles and lubricant in his car.

After he was arrested, Mojocoa waived his *Miranda* rights.[1] He thanked God that he did not have a daughter, for fear of abusing her. And, in a written statement, he admitted responding to the Craigslist ad, offering to pay $60 for oral sex with a 12- or 14-year-old girl, and driving to an agreed-upon location for sex after buying candy and lubricant.

Mojocoa was indicted for attempted enticement of a minor to engage in sexual activity. *See* 18 U.S.C. § 2442.

### B. *The Jail Call*

At trial, the government sought to introduce recorded jail calls between Mojocoa and his wife. During one such call (the only one relevant on appeal), Mojocoa's wife implored him to enter a plea, stating, "there's an absolute case. You confessed"—to which Mojocoa responded "Yeah. I know that. I know." Before such calls, an automated message played twice, informing inmates that the

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

call was "not private" but would be "recorded" and "may be monitored." The message even directs inmates to take certain steps if they believe a call should be private.

Mojocoa filed a motion *in limine*, seeking to prevent the government from introducing the jail calls and various other statements he made in an interview. Mojocoa argued that the conversation was covered by spousal privilege and, even if it was not, it was unduly prejudicial under Federal Rule of Evidence 403. The court overruled the objections, and the calls were published to the jury.

### C.  The Entrapment Instruction

Mojocoa's defense was based on the theory that Fitch and the government had entrapped him. He submitted a modified jury instruction arguing that, while this Circuit has a pattern instruction on entrapment, his instruction better reflected the law of entrapment under *Jacobson v. United States*, 503 U.S. 540 (1992). His main complaint was that the pattern instruction did not clearly state that the burden of proof rested with the government.

After the government argued that the pattern instruction was adequate and Mojocoa's substitute mischaracterized the law, Mojoca submitted a second proposed instruction on the entrapment issue. This proposed instruction read as follows:

> A person is entrapped when he or she is induced or persuaded by law enforcement officials or their agents to commit a crime that he or she had no previous

23-12132                 Opinion of the Court                           7

intent to commit, and the law as a matter of policy forbids his or her conviction in such a case.

However, there is no entrapment where a defendant is ready and willing to break the law and the Government agents merely provided what appears to be a favorable opportunity for the defendant to commit the crime.

The Government has the burden of proving beyond a reasonable doubt that the defendant was not entrapped.

So, a defendant would not be a victim of entrapment if you should find beyond a reasonable doubt that a defendant was ready, willing[,] and able to commit the crime charged in the indictment whenever opportunity was afforded and that Government officers or their agents did no more than offer an opportunity.

On the other hand, if the evidence in the case leaves you with a reasonable doubt whether a defendant had any intent to commit the crimes except for inducement or persuasion on the part of the Government officer or agent, then it is your duty to find the defendant not guilty.

In support of his modified instruction, Mojocoa argued that the pattern instruction included an example that "seem[ed] to direct a verdict for the Government with respect to law enforcement sting operations of the nature in [this] case." The

pattern example reads: "For example, it's not entrapment for a government agent to pretend to be someone else and offer—directly or through another person—to engage in an unlawful transaction[.]" *Eleventh Circuit Pattern Jury Instructions (Criminal Cases)* S13.1 (2022).

At the beginning of trial, the court instructed the jury that the government had the burden to prove guilt beyond a reasonable doubt. The court repeated this admonition in its final instructions.

As for the final entrapment instruction, the district court instructed the jury that the government had the burden to show Mojocoa was not entrapped and that, *"if the government has met its burden*, it is not entrapment for a government agent to pretend to be someone else and offer directly or through another person to engage in an unlawful transaction." (emphasis added).

### D.  Closing Arguments and the Verdict

After the close of the evidence, Mojocoa argued to the jury that the government had failed to prove he was not entrapped into committing the crime because it had not shown he was "predisposed" to commit the crime.

In response, the government stated, at the end of its rebuttal argument, that "[i]n order for you[, the jury,] to find that this defendant was entrapped and he is not guilty, period, you've got to find that this is the most unlucky man on the face of the planet." Mojocoa objected. The court overruled the objection, stating that the comment was simply argument. When the government resumed its rebuttal argument, it repeated the remark, explaining

that Mojocoa went on Craigslist, clicked on the ad, communicated with Fitch, took instructions about what to bring to the encounter, and even wrote down and admitted to his wife that he had done all these things.

The jury found Mojocoa guilty of attempted enticement of a minor to engage in sexual activity, and the court sentenced him to 121 months' imprisonment.

## II.    Discussion

Mojocoa makes four arguments on appeal. First, he contends that the district court erred in denying his motion for a judgment of acquittal. Second, he argues that the district court abused its discretion in admitting the jail call between him and his wife into evidence. Third, he argues that the district court abused its discretion in refusing to give his modified jury instruction on the entrapment defense. And finally, he argues that the government improperly shifted the burden of proof to him in its closing argument. We consider, and reject, each argument in turn.

### A.  *The district court correctly denied Mojocoa's motion for a judgment of acquittal.*

Mojocoa first argues that his motion for a judgment of acquittal should have been granted because the government failed to disprove his entrapment defense—that is, failed to show beyond a reasonable doubt that he was "predisposed to commit the offense of . . . child enticement." Mojocoa suggests that the government initiated contact with him, that the presentation of the victim amounted to "compulsion," and, most importantly, that "the

government presented no evidence" that he "had ever engaged in any child sex-related transactions or activities in his . . . life[.]" Those arguments all fail.

"After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). "We review the denial of a motion for judgment of acquittal *de novo.*" *United States v. Evans*, 344 F.3d 1131, 1134 (11th Cir. 2003). "Since entrapment is generally a jury question, entrapment as a matter of law is a sufficiency-of-the-evidence inquiry that [this Court] review[s] *de novo*, viewing all facts and making all inferences in favor of the government." *United States v. Rutgerson*, 822 F.3d 1223, 1234 (11th Cir. 2016) (footnote omitted). "The jury's verdict cannot be overturned if any reasonable construction of the evidence would allow the jury to find the defendant guilty beyond a reasonable doubt." *United States v. Padron*, 527 F.3d 1156, 1159 (11th Cir. 2008) (alteration accepted) (quotation omitted).

There are two elements to an entrapment defense: (1) the government in some way induced the commission of the crime, and (2) the defendant was not predisposed to commit the crime before inducement. *Rutgerson*, 822 F.3d at 1234. "[I]nducement consists of opportunity plus something like excessive pressure or manipulation of a non-criminal motive." *United States v. Brown*, 43 F.3d 618, 623 (11th Cir. 1995). The defendant bears a "light" burden of production to show inducement. *United States v. Isnadin*,

742 F.3d 1278, 1297 (11th Cir. 2014).  If the defendant meets this burden, then "the burden shifts to the Government to prove beyond a reasonable doubt that the defendant was predisposed to commit the crime."  *Id.*[2]

Predisposition requires "the prosecution [to] prove beyond reasonable doubt that the defendant was disposed to commit the criminal act prior to first being approached by Government agents."  *Jacobson*, 503 U.S. at 548–49.  In other words, the government must prove "that the defendant was actually predisposed to commit the underlying crime absent the government's role in assisting such commission."  *United States v. Aibejeris*, 28 F.3d 97, 99 (11th Cir. 1994) (emphasis omitted).  This "[p]redisposition may be demonstrated by" such things as "ready commission of the charged crime"; the fact that a defendant was "given opportunities to back out . . . but failed to do so"; and "[p]ost-crime statements[.]"  *Rutgerson*, 822 F.3d at 1235 (quoting *Brown*, 43 F.3d at 625).

There was more than enough evidence here for the jury to conclude Mojocoa was predisposed to commit the crime charged—and thus reject his entrapment defense.

To begin with, Mojocoa is wrong factually—the government *did not* initiate contact, Mojocoa did so when he contacted the undercover agent in response to the Craigslist ad.  *See*

---

[2] The government does not dispute that Mojocoa met his burden of production on inducement, so we address only predisposition.

*id.* (having "made the initial contact" with the victim supported a finding of predisposition). A jury could also reasonably conclude that Mojocoa was the first to bring up sex with the would-be-victim, since the ad was ambiguous or at least euphemistic. *See id.* (having "readily proceeded to attempt to arrange a sexual encounter" with the victim supported a finding of predisposition). Mojocoa even expressed a desire to "make [appointments to have sex with the child] a regular thing." Mojocoa "never once said that he did not want to have sex with" a child. *Id.*

Further, a reasonable jury could have found that Mojocoa "persistently pursued [Fitch, the undercover agent] over three days in an attempt to agree on" the details of "a sexual encounter." *Id.* Mojocoa communicated with Fitch for three days and even negotiated the price of sexually assaulting the would-be victim. *See id.* (finding predisposition in part because the defendant went to the effort of "dr[iving] from Miami to Fort Lauderdale for the purpose of paying . . . for sex").

Nor did Mojocoa "back out of his meeting" with Fitch and the would-be-victim, "and [he never] expressed any hesitation about having sex with a minor, although he repeatedly had the opportunity." *Id.*; *see also Brown*, 43 F.3d at 625 ("A predisposition finding is also supported by evidence that the defendant was given opportunities to back out of illegal transactions but failed to do so."). Indeed, Mojocoa's expressed concern was about whether the police officer was part of a sting—which demonstrates his consciousness of wrongdoing, and thus predisposition to commit

the crime if he thought he would not get caught. *Rutgerson*, 822 F.3d at 1235 ("in spite of the expressed concerns that" the undercover agent "was part of a sting operation, [the defendant] continued to pursue a sexual encounter with her"); *see also United States v. Lee*, 603 F.3d 904, 915 (11th Cir. 2010) (holding that the defendant's concern that an online person the defendant intends to have sex with is part of a sting operation supports a relevant inference of guilt because "a relationship with . . . an adult[ ] would not have concerned law enforcement").

Finally, Mojocoa's own statements provided substantial evidence of predisposition. For one, a reasonable jury could have interpreted Mojocoa's expression of surprise that the undercover agent was a woman as an indication that he had engaged in such activity before the sting here. *See Brown*, 43 F.3d at 626 ("Evidence that [the defendant] was actually engaged in drug smuggling prior to contact with Government agents would certainly establish his predisposition to engage in smuggling beyond a reasonable doubt."); *see also Rutgerson*, 822 F.3d at 1235–36 (even where there was "no evidence of prior related offenses," the fact that the defendant "had accessed numerous ads for 'young' prostitutes online" demonstrated his "familiar[ity] with the website he used" and therefore "suggest[ed] that he was predisposed to attempt to entice young women into having sex"). And for another, Mojocoa told law enforcement after his arrest that he was thankful "he didn't have a daughter out of fear of abusing her." *See Brown*, 43 F.3d at 626 (the defendant "made many statements in the record which, if

credited, provide direct proof of his prior involvement in drug smuggling and dealing activities").

Mojocoa disagrees, advancing essentially two arguments in response.[3]    He disputes the strength of some of these factual inferences, and he insists that the government failed to show predisposition *prior* to the government's approach.    Both arguments fail.

First, Mojocoa cannot show that no reasonable jury could make the inferences and draw the conclusions discussed above.  He attempts, for example, to cast the Craigslist ad as "initiat[ing] communication" with him (which, as we have said, is just wrong); he plays up the government's role in sexualizing the would-be-

---

[3] We say "essentially" because Mojocoa also suggests that the presentation of "[a] victim [who] literally could not report any offense" (because "she was . . . non-verbal"), combined with "great sympathy" for the undercover agent and the would-be-rape-victim (because "the[ ] money was desperately needed"), created "compulsion" or an "emotional incentive" for him to rape a disabled minor.

We set this suggestion off to one side because Mojocoa's argument on this point—or, perhaps, the argument made *for* him—is not a *defense*, it is a *confession*.  That Mojocoa could be enticed to commit an offense because the victim was (1) unable to report him and (2) vulnerable, *shows*, not refutes, that he was predisposed to commit the offense.  And the suggestion that a person would be compelled to commit the heinous offense attempted here *because* the victim needed money—recall the story was that she had medical bills and her mother had recently died—is appalling.  A jury would be more than justified in finding that such a child's need for money (which a person could just *give* out of charity) is no inducement to raping her—but rather that evidence of enticement to vulnerability is, itself, evidence of predisposition.

victim by reference to the man who paid $100 for time with her, and the statement that Mojocoa could "do whatever [he] want[ed]" with the child; and he disputes—without explanation—the inference that his surprise at speaking to a woman about the encounter suggests that he had engaged in similar transactions in the past. But even if those were valid critiques of the permissible inferences—and they are not—the inferences are still permissible. And our review here is properly limited to "viewing all facts and making all inferences in favor of the [verdict]." *Rutgerson*, 822 F.3d at 1234.

Second, Mojocoa emphasizes the government must show predisposition prior to the approach of government agents. *See Jacobson*, 503 U.S. at 548–49. But as we have just explained, the government did so. A jury could reasonably conclude that the evidence discussed above proves a predisposition that existed before and independent of Mojocoa's contact with Fitch. The government need not meet its burden by producing evidence of events or conduct that took place in time before the sting operation. *See Rutgerson*, 822 F.3d at 1235 (the "[e]xistence of prior related offenses is relevant, but not dispositive." (quoting *Brown*, 43 F.3d at 625)).

"The long and short of it is that the government agents 'simply provided [Mojocoa] with the opportunity to commit a crime' by posting the [Craigslist] ads, and his 'ready commission of the criminal act amply demonstrate[s the necessary] predisposition." *Id.* at 1236 (quoting *Jacobson*, 503 U.S. at 550).

Thus, a reasonable jury could find that the government proved Mojocoa's predisposition to commit the crime, and the district court correctly denied Mojocoa's motion for a judgment of acquittal.

### B. The district court did not abuse its discretion in allowing the jail call with Mojocoa's wife into evidence.

Mojocoa also argues that the district court should not have allowed the government to introduce the jail call with his wife. He primarily contends that the call was protected by the marital privilege. And, failing that, he asserts that "the jail call should have been inadmissible because . . . the prejudicial effect" of the call "outweighed its probative value" under Federal Rule of Evidence 403.

"We review a district court's decision to admit or exclude evidence for abuse of discretion." *United States v. Reeves*, 742 F.3d 487, 501 (11th Cir. 2014). The marital-communications privilege makes confidential communications between a husband and wife inadmissible. *Blau v. United States*, 340 U.S. 332, 333 (1951); *see also Trammel v. United States*, 445 U.S. 40, 50–51 (1980) (discussing "the privilege against adverse spousal testimony"). We *presume* communications between husband and wife are confidential, but "that presumption can be overcome by proof of facts showing that [the communications] were not intended to be private." *Pereira v. United States*, 347 U.S. 1, 6 (1954). "The presence of a third party negatives the presumption of privacy." *Id*. Rule 403, in turn, provides that "the court may exclude relevant evidence if its

probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. And of course, "[a]n erroneous evidentiary ruling will result in reversal only if the resulting error was not harmless." *United States v. Frediani*, 790 F.3d 1196, 1200 (11th Cir. 2015).

We see no abuse of discretion here. First, the presence of a third party negates the presumption of privacy in spousal communications, *Pereira*, 347 U.S. at 6, and the jail call here was preceded by an automated message that the call "is not private" and "will be recorded." The system even instructed Mojocoa to hang up and take other action if he wanted the call to be private. So the government successfully rebutted the presumption that Mojocoa's conversation with his wife was kept confidential.

Second, the district court had ample discretion to conclude that admission of the jail calls did not violate Rule 403's exclusion of evidence that is substantially more prejudicial than probative. The jail call evidence was prejudicial to Mojocoa's case, to be sure, but it was not *unfairly* prejudicial because it did not "suggest [a] decision on an *improper* basis," *Steger v. Gen. Electric Co.*, 318 F.3d 1066, 1079 (11th Cir. 2003) (emphasis added)—but rather based on the fact that Mojocoa had confessed, *see United States v. Wright*, 392 F.3d 1269, 1277 (11th Cir. 2004) ("consciousness of guilt" may be evidence of guilt). *See also United States v. Tillmon*, 954 F.3d 628, 643 (4th Cir. 2019) (damage to a party's case is not unfair prejudice

under Rule 403, which refers instead to capacity of some concededly relevant evidence to lure factfinder into declaring guilt on a ground different from proof specific to charged offense).

Regardless, any error here was plainly harmless.  A jail call acknowledging that Mojocoa confessed is cumulative of the actual confession—to say nothing of the other, overwhelming evidence of guilt—so either or both supposed evidentiary errors would have been harmless anyway.  *See Frediani*, 790 F.3d at 1202 (finding that any error from admitting evidence was harmless in light of overwhelming evidence of defendant's guilt).

Thus, we find no reversible error in allowing the jail calls into evidence.

### C. The district court did not abuse its discretion in refusing to give Mojocoa's preferred jury instruction on entrapment.

Mojocoa next argues that the district court should have given his requested jury instruction on entrapment.  Mojocoa contends that the instructions as given "provided the possibility that the jury found entrapment on his conduct where the evidence failed to prove his predisposition[.]"

We review jury instructions *de novo* "to determine whether they misstate the law or mislead the jury to the objecting party's prejudice," *United States v. Gomez*, 580 F.3d 1229, 1233 (11th Cir. 2009) (quotations omitted), but we review a "district court's refusal to give a requested jury instruction" only for abuse of discretion, *United States v. Mayweather*, 991 F.3d 1163, 1174, 1183 (11th Cir.

2021).  "So long as the district court's jury instructions accurately reflect the law, the trial judge has wide discretion to decide on the style and wording of the instruction." *United States v. Singer*, 963 F.3d 1144, 1162 (11th Cir. 2020) (alteration adopted) (quotation omitted).  Thus, our job on appeal is to "examine the jury charges as a whole, determining whether the entire charge sufficiently instructed the jury about the issues." *Id.* at 1162–63 (alterations adopted) (quotations omitted).

We reject Mojocoa's argument that the district court abused its discretion in not giving his modified version of the entrapment instruction.  Considered as a whole, the jury instructions given by the district court explained that (1) government had the burden of proving the case beyond a reasonable doubt; (2) the jury would have to find beyond a reasonable doubt that the government only offered him an opportunity to commit a crime he was already willing to commit, and (3) the jury would have to find him not guilty if there was reasonable doubt about whether he was willing or predisposed to commit the crime without government persuasion.  Those instructions are an accurate statement of the law. *See Jacobson*, 503 U.S. at 548–49 (holding that, to overcome the defense of entrapment, "the prosecution [must] prove beyond reasonable doubt that the defendant was disposed to commit the criminal act prior to first being approached by Government agents.").  Thus, the court was "not required to adopt the precise wording of [Mojocoa's] proposed charge[.]" *Singer*, 963 F.3d at 1163.

"In short, the district court's jury instructions adequately covered [Mojocoa's] proposed instruction, and the district court did not abuse its discretion when it declined to give [his] proposed jury instruction[.]" *Id.* We therefore find no abuse of discretion in refusing to give Mojocoa's custom instruction.

### D. The district court did not commit reversible error in failing to correct the government's closing argument.

Finally, Mojocoa argues that the government improperly attempted to shift the burden of proof during its closing argument when it told the jury that, "[i]n order for you to find that this defendant was entrapped, and he is not guilty . . . you've got to find that this is the most unlucky man on the face of the planet." According to Mojocoa, the district court's failure to admonish the government or give a curative instruction was error because it allowed the government to argue an improper understanding of the parties' burdens of proof—which led the jury to "convict[ him] on less than [the evidence] required and the [process] guaranteed to him[.]"

We review claims of prosecutorial misconduct during closing arguments *de novo*, bearing in mind that such claims generally involve mixed questions of law and fact. *United States v. Sosa*, 777 F.3d 1279, 1294 (11th Cir. 2015). "To find prosecutorial misconduct, a two-element test must be met: (1) the questions or comments must be improper, and (2) the questions or comments must prejudicially affect the substantial rights of the defendant." *United States v. Schmitz*, 634 F.3d 1247, 1267 (11th Cir. 2011).

To be sure, it is improper for prosecutors to "mak[e] burden-shifting arguments which suggest that the defendant has an obligation to produce any evidence or to prove innocence." *United States v. Simon*, 964 F.2d 1082, 1086 (11th Cir. 1992). Comments "may be so prejudicial as to shift the burden of proof" if they are "so pronounced and persistent that [they] permeate[] the entire atmosphere of the trial[.]" *Id.* at 1086 (quotation omitted); *see also United States v. Nerey*, 877 F.3d 956, 970 (11th Cir. 2017) (listing factors we consider to determine the extent of the prejudice).

Assuming prosecutorial comments are improper, "[a] defendant's substantial rights are prejudicially affected when a reasonable probability arises that, but for the remarks, the outcome of the trial would have been different." *United States v. Eckhardt*, 466 F.3d 938, 947 (11th Cir. 2006). But "substantial evidence establishing guilt may counteract claims of prejudice," *Nerey*, 877 F.3d at 970, as long as the strength of the evidence suggests that "any error is harmless," *Eckhardt*, 466 F.3d at 947. And prejudice can be mitigated or cured by jury instructions properly allocating the burden of proof. *See Schmitz*, 634 F.3d at 1267.

We see no basis for reversal. To start, we can see why the district court did not think the government's comment was improper. In telling the jury that, to find the lack of predisposition necessary to entrapment, the jurors would need to "find that [Mojocoa was] the most unlucky man on the face of the planet," the government was arguing that Mojocoa had made a series of choices, of his own volition, that led him to such a place that he

would otherwise have to be profoundly unlucky to find himself. The district court had discretion to find that the jury would understand the comments that way—not as shifting some burden of proof to Mojocoa. At any rate, Mojocoa cannot show reversible error.

Even if the government's comments were improper, or at least ran an unacceptable risk of confusing the jury, Mojocoa has not shown the comments prejudiced his substantial rights. Again, to obtain reversal, Mojocoa must show that, "but for the remarks, the outcome of the trial would have been different." *Eckhardt*, 466 F.3d at 947. Here, however, the court's instructions to the jury (at both the beginning of the trial and after closing arguments) clearly pointed out that the government had the burden of proof. *See Schmitz*, 634 F.3d at 1267 ("[E]ven if some of the prosecutor's questions slightly suggested that Schmitz had the burden of proof, the district court cured any possibility of prejudice with its clear and repeated instructions on the prosecution's burden of proof."). And the evidence against Mojocoa was *very* strong. Mojocoa was caught red-handed at the meeting place, with the items he was supposed to bring, after discussing the encounter in detail in recorded messages and phone calls. He admits all of these facts. His only defense at trial was entrapment, which—for the reasons discussed above—was powerfully refuted by evidence of his willingness to participate in the sale of a young, disabled girl for sex. *United States v. Bergman*, 852 F.3d 1046, 1070 (11th Cir. 2017) (prosecutor's "lone [improper] comment" did not warrant reversal of jury's verdict "[g]iven the abundant evidence supporting the

defendants' guilt"). So, far from being likely that the outcome would be different, it is affirmatively *un*likely the outcome of the trial would have been any different had the district court admonished the government or redirected the jury.

Mojocoa nonetheless insists that the government's comment was not merely a response to his position, but rather "its ultimate summation of what the jury needed to determine in this case." Again: the district court had discretion to find otherwise, but it does not matter, because Mojocoa cannot show prejudice. To the contrary, Mojocoa offers no answer to the mitigating effect of the jury instructions, relying entirely on the supposition that "the government failed to meet its burden of proof as to predisposition." Because that supposition is wrong, his argument here fails.

We therefore find no reversible error related to the government's comments at closing argument.

### III.    Conclusion

All told, we find no merit in Mojocoa's arguments on appeal, and so affirm the judgment below.

**AFFIRMED.**